RICHARDSON PRESS v. VANDERGRIFT.   (No. 6432.)

(Supreme Court, Appellate Division, First Department.   December 4, 1914.)

1. CORPORATIONS (§ 453*)—CONTRACTS—LIABILITY OF OFFICERS.

Where plaintiff addressed a letter to the president of a corporation as such, and offered a yearly contract for the printing of a publication of the corporation according to specifications and prices stated, and the president in his individual capacity replied the following day by letter stating, "We" are in receipt of the offer for the printing of "our" publication; "We accept the terms," and this acceptance to constitute the contract "between us," the correspondence established a contract between plaintiff and the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1798, 1799; Dec. Dig. § 453.*]

2. SALES (§ 82*)—CONSTRUCTION OF CONTRACT—TERMS OF PAYMENT—CONDITIONS.

Where a contract by plaintiff for printing for defendant its publication for a year, and cards, letter and bill heads, was silent as to terms of payment, plaintiff could demand payment as a condition for the delivery of each item called for by the contract.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 229–233; Dec. Dig. § 82.*]

3. FRAUDS, STATUTE OF (§§ 33, 158*)—ORIGINAL PAROL PROMISE—EVIDENCE.

Evidence *held* to show that the president of a corporation orally promised to pay a contractor, for printing for the corporation, the indebtedness to be incurred under the contract, in consideration of the contractor continuing to perform, after declining to do so because of his doubt of the ability of the corporation to pay, so as to take the promise out of the statute of frauds.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. §§ 50–53, 56, 373–376; Dec. Dig. §§ 33, 158.*]

Ingraham, P. J., and Dowling, J., dissenting.

Appeal from Trial Term, New York County.

Action by the Richardson Press against Joseph H. Vandergrift. From a judgment dismissing the complaint at the close of plaintiff's case, it appeals. Reversed, and new trial granted.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, DOWLING, and HOTCHKISS, JJ.

George T. Hogg, of New York City, for appellant.

Walter W. Irwin, of New York City, for respondent.

HOTCHKISS, J.   The complaint alleges that between October 6, 1911, and October 8, 1912, plaintiff furnished materials and performed work of the value of upwards of $9,900, of which upwards of $6,000 has been paid on account, and that the balance, $3,876.14, remains due; that part of the materials and labor were originally ordered by the Oceanic Publishing Company in connection with a publication called "Dogs in America"; that before the materials were furnished and the services rendered "for the said balance remaining unpaid * * * the plaintiff duly declined to furnish and perform * * * the same for said company alone, whereupon, at the special instance and request of the defendant, and for his benefit, the materials were

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

furnished" and labor ·performed for said company, in consideration whereof defendant and the company severally promised to pay. In its bill of particulars, plaintiff states that the materials and labor aggregating the $9,900, were furnished and performed between September 26, 1911, and September 30, 1912; that the dates on which the materials were furnished and the work was done, "for the balance unpaid on account thereof, were * * * on and after about the 21st of November, 1911"; and that the date on which defendant requested plaintiff to furnish the materials and perform the work was also "on or about November 21, 1911," the time when orders were received for the Christmas number of "Dogs in America," and before said orders were accepted.

[1] Plaintiff argues for a reversal on two theories: (1) That defendant, and not the Oceanic corporation, was the original contractor in whose behalf all of the work was done. This is not the theory of the complaint, nor of the bill of particulars. But, passing that point, plaintiff appeals to its Exhibits A and B. Exhibit A is a letter, dated July 5, 1911, in its material parts, as follows:

"New York, July 5, 1911. Mr. Joseph B. Vandergrift, President Oceanic Publishing Company—Dear Sir: We offer the following specifications as a basis for a yearly contract for the printing of your biweekly, 'Dogs in America.'"

The remainder of the letter relates exclusively to the specifications and prices of the proposed work. Exhibit B is as follows:

"'Dogs in America.' Oceanic Publishing Company. Jos. B. Vandergrift, Pres. Frank J. Carlton, Vice Pres. and Secretary, J. Willoughby Mitchell, Treas. New York, July 6, 1911. Richardson Press, 156 Leonard Street, New York City—Gentlemen: Please be advised that we are in receipt of your communication of July 5, 1911, setting forth your offer and its. terms for a weekly contract for the printing of our biweekly, 'Dogs in America.' We accept the terms therein contained, your letter of July 5th and this acceptance to constitute the contract between us. Very truly yours, Jos. B. Vandergrift."

There is no question that, at the time these letters were written, Vandergrift was president of the Oceanic Publishing Company. I do not think these letters make out a personal contract on his part. It is true that his letter of July 6th is signed by him individually, and not as president; but it is evident from the pronouns, "we," "our," and "us," that the writer was not assuming to speak in his individual behalf. Moreover, defendant's letter was in answer to plaintiff's of day previous, and that letter was addressed to defendant in his capacity as president, and not as an individual. The subject covered by the letters was one concerning which plaintiff was fully advised, and it knew that the business to which its letters related was the business of the corporation, and not that of the defendant. It is evident, therefore, that the plaintiff was seeking a contract from the corporation, that it made its offer to the corporation, and that it knew when it received defendant's reply that he was acting for the corporation. The cases cited by the appellant, where the addition of the title of an office held by a person assuming to contract in his individual name, was held to be descriptio personæ, are clearly distinguishable.

[2, 3] (2) Plaintiff's second theory is the one on which the com-

plaint and bill of particulars rest, namely, that, after the business had been going on for some time, plaintiff demurred to proceeding further because of its doubt of the Oceanic Company's ability to pay, and that plaintiff was induced to proceed and furnish the corporation with the labor and material sued for on defendant's promise to pay therefor. As affecting this theory, the record is confused, inasmuch as. the testimony was brought out most disjointedly. But the following appears: Aberle, secretary of plaintiff, had numerous conversations with defendant concerning the work then being performed by plaintiff, and its claim on account thereof, which conversations began approximately in July, 1911, and the last "was when we were working on the Christmas edition; this was in October or November of that year." "The witness. I said to Mr. Vandergrift that the number would cost a great deal of money, more money than was necessary to produce what he was aiming at. Mr. Vandergrift said he did not care how much it cost; that he was personally responsible for the number; that he was spending his money this way because it was a fad of his; * * * that, if he did not spend his money in this way, he would be spending more in some other way; that it was a personal matter with him. Q. What did you do after that conversation? A. We proceeded with printing. The publication was then—this is the heavy edition—was then in the process of being printed, which took probably a month."

The witness further testified that for a number of weeks after this conversation he saw defendant almost daily, "and he constantly reiterated that it was a personal matter with him, * * *, that it was a fad with him, * * * a personal matter. * * * He would pay everything that he ordered, and everything that the company ordered he was responsible for. 'I am good 'for it, and you know I am good for it.' " "By the Court: He said he was responsible for everything that the company ordered, is that it? A. Said he was responsible for everything the company ordered; he repeated that in various ways a number of times." After this plaintiff printed and delivered the Christmas number, "which made our bill about $2,000." The witness was then asked: "Q. Go on and tell what you did. A. We turned out the number—that particular Christmas number—which made our bill about $2,000." And over plaintiff's exception the question and answer was struck out. The court then said: "You may state, if you know, what work was done after that date"—referring, I take it, to the date of these conversations, and the witness answered: "The work was the printing of the publication, * * * the composition, printing, and binding of this publication, called 'Dogs in America.' We also done various other jobs, such as cards, letter heads and bill heads for the Oceanic Publishing Company." The witness further testified that plaintiff printed and delivered the next number of the publication, and continued so to do with succeeding numbers from that date until October, 1912. Later on the witness was asked when plaintiff got the order for the Christmas number of the publication, and he replied that there was no specified date, but. that the order was spoken of from July on. He was then asked:

"Did you have a subsequent conversation respecting it? A. Yes; we had a number of conversations between July and — Q. How did it come up? A. Came up by my asking how the thing would be financed; it would be a heavy edition. Q. You asked him that? A. I asked him that repeatedly. Q. Then what did he say? A. He always stated: 'Now, don't you worry about this. I am back of this, you know. I am all right, and I will pay everything that I order for this company, and everything that is turned out for the company.' Q. All this work that you speak of, and that is included in this claim, was work that you did for this company? A. Yes, sir. Q. Subsequent to these conversations, was it? A. That was subsequent to this conversation, yes." After the Christmas number was delivered, and when the balance of plaintiff's account amounted to about $2,000, the witness repeatedly asked defendant for payments on account. Small payments were in fact made, and, as an excuse for not paying more, defendant said that he did not have full control of the publication, and did not care to pay any more money until he had such control, which he expected to get, and defendant said: "You know perfectly well I told you I would pay you, and I will see— I will carry that out." These conversations continued until April, 1912.

Krulan, a witness for plaintiff, testified that he had conversations with defendant respecting the work that was being done by plaintiff, beginning about two months before Christmas, 1911, and continuing to about a month after Christmas. This was some weeks after plaintiff began to do defendant's work, and bills had already been incurred. Witness said to defendant: " 'We have extended credit, 30 days' credit.' When it was due, I demanded the money from Mr. Vandergrift, and he stated, 'You need not worry, as you know I am behind this;' and the same as to the Richardson Press, he says, 'They need not worry and I assure you you will get all the money that is coming to you, whatever is ordered in this office.' " In his deposition, read by plaintiff, defendant swore that plaintiff rendered accounts "very regularly," and when received by witness he handed them to the bookkeeper. What was meant by "very regularly" does not appear. The full account, however, was put in evidence. The first debit item is October 6, 1911, and the last September 30, 1912. The monthly debit balances were as follows: 1911—October, $469.45; November, $573.82; December, $2,112.64. 1912—January, $2,648.74; February, $2,906.44; March, $2,470.75; April, $2,789.92; May, $3,163.81; June, $3,186.56; July, $3,263.99; August, $3,585.90; September, $3,904.14; October, $3,876.14, the amount sued for.

The court dismissed the complaint on the theory that defendant's promise was within the statute of frauds; but I think there was sufficient prima facie to support the theory of an original promise on defendant's part to pay plaintiff's bills thereafter incurred for work then in course of performance and uncompleted by delivery, and work that should be thereafter undertaken, and goods that should thereafter be delivered. The contract is silent as to terms of payment, and plaintiff might have demanded payment as a condition for the delivery of each item entering into the aggregate sued for. In this situation de-

fendant, an officer of the contracting corporation and greatly interested in the successful promotion of its enterprise, in consideration of plaintiff's continuing its labors and delivering the finished product, and as well other items theretofore and thereafter ordered by the corporation, promised to pay the indebtedness to be incurred by it. The case is directly within Schwoerer & Sons v. Stone, 130 App. Div. 796, 115 N. Y. Supp. 440, affirmed 200 N. Y. 560, 93 N. E. 1116.

The judgment should be reversed, and a new trial granted, with costs to appellant to abide the event.

McLAUGHLIN and LAUGHLIN, JJ., concur. INGRAHAM, P. J., and DOWLING, J., dissent.